## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BP ENVIRONMENTAL | : | |
| SERVICES, INC., | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | No. 12-4103 |
| v. | : | |
| | : | |
| REPUBLIC SERVICES, | : | |
| INC., | : | |
| Defendant | : | |

## MEMORANDUM

ANITA B. BRODY, J.                                                                                      May 21, 2013

 

Plaintiff BP Environmental Services, Inc ("BP") brought suit against Defendant Republic

Services, Inc. ("Republic"), claiming tortious interference with its existing and prospective

contracts as well as breach of contract. Republic moved for summary judgment on all counts. For

the reasons explained below, I will grant Republic's motion.

### I.        FACTUAL BACKGROUND[1]

Plaintiff BP is a Pennsylvania corporation that brokers waste removal and recycling

services. During the 2010-2011 period, it had active contracts with between 650 and 750

different customers around the country and earned roughly $16 to $20 million in business.

Defendant Republic is a Delaware corporation. It is the ultimate parent company of several

subsidiaries, including BFI Waste Systems of North America, LLC d/b/a/ Republic Services

National Accounts ("BFI North America"), and BFI Waste Services of Pennsylvania, LLC ("BFI

---

[1] When reviewing a motion for summary judgment, I consider the facts in the light most favorable to the nonmoving party, in this case Plaintiff BP.

PA"). In 2008, Republic acquired Allied Waste Industries, Inc. ("Allied Waste"), becoming the

ultimate parent corporation of Allied Waste and its subsidiaries. Republic maintains that it does

not operate as one merged company with, nor is it the successor-in-interest to, Allied Waste, BFI

North America, or BFI PA.

Starting sometime in 2001, BP began performing work for Bridgeview, Inc. ("Steri-

Bridgeview"), an affiliate of Stericycle, Inc. ("Stericycle"). On Jan. 1, 2005, BP entered into a

written agreement with Steri-Bridgeview to provide solid waste removal services. That

agreement was to extend for seven years, or until December 31, 2011. On May 1, 2008, BP

entered into written agreement with Stericycle Baltimore ("Steri-Baltimore"), another Stericycle

affiliate, again to provide waste removal services. That contract was to extend for three years, or

until April 30, 2011. BP drafted both agreements. Neither contract contained an exclusivity

clause, and neither contract set a specific or minimum haul volume.[2] In other words, the

contracts on their face were silent as to how much waste BP would remove for Steri-Baltimore

and Steri-Bridgeview.

Both agreements allowed BP to subcontract with third parties to perform the waste

removal services. To that effect, in November 2004, BP and an entity affiliated with BFI/Allied

Waste[3] executed a Service Agreement under which BFI/Allied Waste agreed to provide waste

hauling services for BP's Steri-Bridgeview account. The agreement was to extend for seven

years, or through December 31, 2011. Republic does not dispute that it was aware of BP's

contracts with Stericycle. However, it is also undisputed that BP never shared with Republic the

---

[2] The BP/Steri-Bridgeview contract stated that BP "anticipates six pulls per day including Saturday." The BP/Steri-Baltimore contracted stated that BP "anticipates assisting Stericycle with disposal services for up to 2000 tons per month." Both contracts stated that "fee adjustments, including those relating to changes in frequency of collection service . . . must be agreed to verbally [and/or] in writing."
[3] It is not entirely clear who signed this agreement with BP, as three entities are referenced in the contract: The BFI business logo appears on the first page of the agreement; the signature line describes an unspecified "Browning-Ferris Industries Subsidiary;" and Allied Waste appears as the signatory to the contract.

contents or specific terms of its Stericycle contracts.

This lawsuit centers around an agreement that occurred years later, in 2010, between Republic's subsidiary, BFI North America, and Stericycle. On July 14, 2010, BFI North America entered into a Special Waste Agreement with Stericycle ("BFI-Stericycle Agreement"). Under the terms of the BFI-Stericycle Agreement, BFI North America or an affiliated entity agreed to provide waste services for Stericycle locations throughout the country for a set fee. For certain Stericycle locations, BFI North America's service was to begin immediately. For others, including Steri-Baltimore and Steri-Bridgeview, Stericycle agreed to switch all services to BFI North America as soon as its agreements with its other providers would allow. Accordingly, the chart listing Stericycle's national facilities and that was attached to the agreement noted that BFI North America could begin work on the Baltimore account on May 1, 2011, and on the Bridgeview account on January 1, 2012. These dates correspond to the dates on which Stericycle's contracts with BP expired. Finally, in a single exception to BFI North America's exclusive rights, the BFI-Stericycle Agreement expressly permitted Stericycle to continue to use BP to perform broker services for both the Baltimore and Bridgeview accounts.

Following the execution of the agreement between BFI North America and Stericycle, Stericycle ceased BP's hauling services on the Bridgeview and Baltimore accounts, which BP says caused it to suffer a loss of $2.8 million in revenue. BP filed suit against Republic in 2012, bringing three claims: (i) tortious interference with its existing contracts with Stericycle; (ii) tortious interference with its prospective contracts with Stericycle; and (iii) breach of the contract between BP and BFI/Allied Waste. Following discovery, Republic filed a motion for summary judgment, arguing that BP has failed to establish facts that could prove any of its three alleged claims.

## II.       LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Finally, a federal court sitting in diversity is required to apply the substantive law of the state whose law governs the action. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agree that Pennsylvania law governs this dispute. "When ascertaining Pennsylvania law, the decisions of the Pennsylvania Supreme Court are the authoritative source." *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010).

**DISCUSSION**

A.    **Tortious Interference With Contracts**

In Count I of its Amended Complaint, BP alleges that Republic tortiously interfered with the BP/Stericycle contracts relating to both the Baltimore and Bridgeview accounts. In Count II, BP alleges that Republic tortiously interfered with its prospective contracts with Stericycle, which it anticipated executing after its Baltimore and Bridgeview contracts expired in 2011. To prove tortious interference with an existing or prospective contract under Pennsylvania law, BP must prove four elements: (1) the existence of a contractual relationship or prospective contractual relationship between the plaintiff and another party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship or preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. *See Phillips v. Selig*, 959 A.2d 420, 428-29 (Pa. Super. Ct. 2008); *see also* Restatement (Second) of Torts, § 766-766B (1979).[4]

---

[4] The Restatement (Second) § 766 defines Intentional Interference with Performance of Contract by Third Person as follows:
> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Section 766B, on interference with prospective contract, reads:
> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> (b) preventing the other from acquiring or continuing the prospective relation.

Section 767 details the factors a court considers to determine whether the actor's conduct is "improper":
> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
> > (a) the nature of the actor's conduct,
> > (b) the actor's motive,
> > (c) the interests of the other with which the actor's conduct interferes,

Republic argues that BP cannot prove either the second or third elements with respect to its claims for tortious interference with existing contract (Count I) or tortious interference with prospective contract (Count II). In addition, with respect to Count II, Republic argues that BP cannot prove the first element—namely, the existence of a prospective contractual relationship. I find that BP fails to prove the second element, that Republic acted without privilege or justification, required to prove both Count I and Count II. I also find that, specifically for Count II, BP cannot prove that it had a prospective contract with Stericycle.

### i.     Absence of Privilege or Justification

The third element of tortious interference—that the defendant acted without privilege or justification—"requires proof that the defendant's actions were improper under the circumstances presented." *Phillips*, 959 A.2d at 429. In determining whether a defendant acted improperly, Pennsylvania courts look to the factors enumerated in Restatement § 767:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

*Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 393 A.2d 1175, 1184 (Pa. 1978). In evaluating whether a defendant acted improperly, "the central inquiry is whether the defendant's conduct is sanctioned by the rules of the game which

---

(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.

society has adopted." *Phillips*, 959 A.2d at 435 (internal quotation marks

omitted).

The law recognizes that companies may compete with each other without

unlawfully interfering with the other's business relationships. As the Third Circuit

explained in *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 215 (3d Cir.

2009),

> Pennsylvania has adopted section 768 of the Restatement (Second) of
> Torts, which recognizes that competitors, in certain circumstances, are
> privileged in the course of competition to interfere with others' prospective
> contractual relationships. *See Gilbert v. Otterson*, 379 Pa. Super. 481, 550
> A.2d 550, 554 (1988). The law necessarily recognizes this privilege
> because if more than one party seeks to sell similar products to prospective
> purchasers, both necessarily are interfering with the other's attempt to do
> the same thing. Moreover, even if an entity has an existing contractual
> relationship with another entity, a stranger to the relationship must be
> privileged to seek to replace one of the entities lest competition be stifled.
> Thus, under section 768: "[o]ne who intentionally causes a third person
> not to enter into a prospective contractual relation with another who is his
> competitor or not to continue an existing contract terminable at will does
> not interfere improperly with the other's relation if: (a) the relation
> concerns a matter involved in the competition between the actor and the
> other; (b) the actor does not employ wrongful means; (c) his action does
> not create or continue an unlawful restraint of trade; and (d) his purpose is
> at least in part to advance his interest in competing with the other."

The Third Circuit further defined "wrongful means" as conduct that is "actionable

for a reason independent of the claim of tortious interference itself." *Id.*

Therefore, in order to prove the third element of a tortious interference claim, BP

must prove that Republic's conduct violated the "rules of the game"—and

amounted to more than mere competition, which the law protects.

Republic argues that, because the contracts between BP and Stericycle were non-

exclusive, Republic did not act improperly or employ wrongful means in negotiating its

own arrangement with Stericycle through its subsidiary. BP contests this assertion. It

7

claims that its agreements with Steri-Bridgeview and Steri-Baltimore gave BP exclusive hauling rights, and that therefore the Republic subsidiary's contract with Stericycle interfered with BP's protected business interests.

BP's tortious interference claim hinges on this question of exclusivity, but it offers only meager evidence to support its claim that the contracts were exclusive. BP President Louis Pellegrino testified that, "[f]rom BP's perspective," the contracts were exclusive. When asked to show which provisions in the contracts granted such exclusivity, Pellegrino could only point to "history": "It is understood through history, through repeated performance, that we will handle 100 percent of their business. That is the agreement. That is the inferred and the history agreement between us and Stericycle as well as Republic." Pellegrino further testified that Stericycle representatives, "at the time of signing, made it very clear that we would receive all of the volume coming out of those locations." BP did not depose any Stericycle representatives. Besides Pellegrino's testimony, BP offers the fact that BP had previously been the only waste hauler servicing the Bridgeview and Baltimore facilities. Finally, BP states, without citation, that "contracts do not need to state that they are exclusive in order to be exclusive." Pl.'s Resp. to Def.'s Mot. for Summ. J. 9. This is the sum total of BP's evidence that its contracts were exclusive.

Under Pennsylvania law, when "the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing. Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995). Further, "a

contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions." *Id* (*quoting Samuel Rappaport Family Partnership v. Meridian Bank*, 657 A.2d 17, 21 (Pa. Super. 1995). Here, BP has failed to point to any ambiguity in its contracts with Stericycle that would allow the court to incorporate external evidence about what the parties intended. Rather, the contracts were clear: BP agreed to provide "non-hazardous solid waste disposal services," and Steri-Baltimore and Steri-Bridgeview agreed to pay certain prices for those services. No provision granted BP exclusive rights, and no provision set a minimum haul volume. Indeed, the Baltimore agreement stated only that BP "*anticipates* assisting Stericycle with disposal services for up to 2000 tons per month"; the Bridgeview agreement stated that BP "*anticipates* six pulls per day including Saturday" (emphasis added). This language is clear—and it is non-exclusive. Examining the contract on its face, I find that it did not grant exclusive rights to BP.

Because the contracts between BP and Stericycle were not exclusive, Republic did not act in contravention of "the rules of the game" when its subsidiary approached Stericycle with its own offer. *See Kennametal, Inc. v. Subterranean Equipment Co.*, 543 F. Supp. 437, 440 (W.D. Pa. 1982) (finding that defendant's conduct, in cutting out plaintiff middleman to sell directly to customers, was "proper and within the realm of acceptable business behavior" where the non-exclusive agreement between the defendant and plaintiff "did not restrict the rights of [plaintiff] to compete in the marketplace"). Republic did not employ "wrongful means"—conduct that would be independently actionable—when it cut out BP as a middleman and negotiated directly with Stericycle.

An examination of the factors of Restatement § 767 further confirms that Republic did not act improperly. First, as to the nature of Republic's conduct, Republic

acted above-board. It did not abuse a position of trust, like the defendants did in *Adler,*

*Barish,* 393 A.2d 1175 (Pa. 1978) (noting that the defendants leveraged their "position of

trust and responsibility" with the plaintiff firm in seeking to seize the firm's clients), nor

did it employ misrepresentations or fraud. Its conduct was not independently tortious.

This factor weighs against a finding of improper conduct.

Second, as to Republic's motive, BP has failed to demonstrate that Republic acted

with a specific intent to harm BP. BP relies on two pieces of evidence to prove

Republic's specific intent to harm BP. First, in June 2010, Republic's Area Sales

Manager for the Philadelphia region, Tom Carrigan, sent an email to Republic's Area

Director, Dean DiValerio, urging them to discuss "the commencement of an offensive

strategy" against BP. BP finds this email significant because it was sent just weeks before

BFI North Agreement contracted with Stericycle, and because Dean DiValerio was BP's

main contact at Republic. BP also presents evidence showing that Carrigan and DiValerio

were aware of BP's contracts with Stericycle.

The second piece of evidence BP offers as proof of Republic's intent to harm BP

is the deposition of Republic's General Manager, Matthew Healy. Healy testified that he

had "reservations" about entering into a national agreement with Stericycle, explaining,

"I wanted to make sure that we were not infringing on our contract [with BP]." Healy

expressed these reservations to both Carrigan and DiValerio. BP states that this is proof

of Republic's "clear intent to do harm" when its subsidiary contracted with Stericycle.

In response, Republic argues that BFI North America's contract with Stericycle

displays a specific intent *not* to harm BP. First, Section 1 of the contract states that

locations—including Baltimore and Bridgeview—that were receiving service from a

competitor "shall continue to do so pursuant to the terms and conditions of the existing agreement until such Exclusive Locations are available to receive service from Republic." The attachment to the contract lists the Bridgeview and Baltimore locations and notes that they would be rolled into the BFI-Stericycle agreement starting on January 1, 2012 and May 1, 2011, respectively—in other words, the first day after which BP's contracts with Stericycle would have expired. Second, Section 17 of the contract explicitly allows Stericycle to employ BP as a broker at the Bridgeview and Baltimore locations, an exception to its exclusive agreement that applied only to BP. Therefore, Republic argues, the BFI-Stericycle contract is strong evidence that Republic acted to *protect*, and not to harm, BP's interests, both as to its existing contracts and as to its prospective future dealings with Stericycle.

Further, Healy's testimony that BP uses as evidence for Republic's bad intent actually shows the opposite. Healy's reservations about interfering with Republic's contracts with BP, and the conversations he had with his superiors to that effect, demonstrate Republic's concern that it not breach any agreement with BP. That Healy was concerned shows not an intent to harm but rather a specific effort to ensure that Republic's conduct was appropriate.

Given these facts, no reasonable fact-finder could conclude that Republic acted with a specific intent to harm BP, either with respect to its existing contracts with Stericycle or its prospective contracts. One email among managers that mentions an "offensive strategy" is not sufficient to show intent to harm. When taken together with the weighty evidence showing Republic's specific efforts to protect BP, there is simply no evidence that Republic acted with intent to harm BP. This factor therefore weighs

against a finding of improper conduct.[5]

Third, as to BP's interests with which Republic interfered, BP's contracts with Stericycle were not exclusive, so Republic's conduct only tangentially interfered with its business interests. As a result, BP has not proven that Stericycle actually breached its contract with BP. This factor weighs against finding improper conduct.

Fourth, as to the interests Republic sought to advance, a defendant's economic interest "will normally prevail over a similar interest of the other if the actor does not use wrongful means. (See § 768)." Restatement (Second) of Torts, § 767 Cmt. f. But if the plaintiff's interest has been solidified in a binding contract, "that interest will normally outweigh the actor's own interest in taking that established right from him." *Id*. Because BP's contract with Stericycle was not exclusive, it can be analogized to an at-will contract. Section 768 explains that such a defendant cannot be found to have tortious interfered with such at-will contracts unless it used "wrongful means". Republic used no wrongful means, and thus its interest will normally prevail over BP's interests in its non-exclusive contract. This factor therefore weighs against a finding of improper conduct.

The final two factors weigh in favor of a finding of improper conduct. As to the fifth factor, the proximity of Republic's conduct to the interference, Republic signed with Stericycle in July 2010. It is undisputed that, within five months of the BFI-Stericycle agreement, Steri-Bridgeview and Steri-Baltimore ceased using BP for its waste removal. Finally, as to the relations between the parties, Republic had contracted with BP to perform BP's contractual obligations to Steri-Bridgeview and Steri-Baltimore. Republic

---

[5] Republic's affirmative steps to protect BP's contracts with Stericycle are likely enough, on their own, to defeat BP's tortious interference claims. *See Thompson Coal Co. v. Pike Coal Co*., 412 A.2d 466, 471 (Pa. 1979) (plaintiff failed to show any contract right that was injured where defendant's contract with the third party honored plaintiff's leasehold interest and conveyed the products subject to plaintiff's lease).

profited from its position as BP's subcontractor.

Of the six factors, only the last two weigh in favor of finding that Republic's conduct was improper. The other factors, taken together, strongly weigh against such a conclusion. Republic employed no wrongful conduct. As discussed above, BP's contracts with Stericycle were not exclusive. Republic's competitive actions were taken, at least in part, to protect its own legal interests, and therefore were within the bounds of proper business conduct. *See Phillips*, 959 A.2d at 435-36 (defendants' actions "were unquestionably taken, at least in part, to protect their own legal rights and interests under the NLRA. As a result, we cannot conclude that [their actions] . . . violated any of the 'rules of the game' or were in any way improper for purposes of a tortious interference claim"). Importantly, BP has no provided evidence sufficient to show that Stericycle breached its contract with BP—meaning that Republic cannot held liable for inducing such a breach.

Because BP's contracts with Stericycle were not exclusive, and because the factors spelled out by the Restatement weigh strongly against finding that Republic acted improperly, I find that BP has failed to show that Republic lacked a privilege or justification for its behavior. As a result, BP has failed to prove another necessary element of its tortious interference claims, and thus Republic is entitled to summary judgment.

### ii.      Existence of a Prospective Contractual Relationship

In addition to its claim that Republic tortuously interfered with its existing contracts with Stericycle, BP alleges that Republic interfered with BP's *prospective* contractual relations with Stericycle. BP claims that it "rightfully had an expectation that

13

the brokerage relationship with Stericycle Baltimore and Bridgeview, Inc. would continue through at least the end of the term of the Service Agreements, and potentially into the future." Pl.'s Am. Cmpl. ¶ 23.

To prove a claim for tortious interference with prospective contracts, a plaintiff must prove all of the same elements, listed above, of a claim for tortious interference with an existing contract, although the first element requires proof of the existence of a *prospective* contractual relationship. "Defining a 'prospective contractual relationship' can be difficult." *Phillips*, 959 A.2d at 428. "It is something less than a contractual right, something more than mere hope." *Id.* (internal quotation marks omitted). To satisfy this first element, a plaintiff must show that it is reasonably probable that, but for the wrongful acts of the defendant, the plaintiff would have had a contractual relationship with a third party. *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979). Here, BP must show a reasonable probability that, absent Republic's actions, Steri-Bridgeview and Steri-Baltimore would have renewed its contracts with BP in the future.

In determining this "reasonable probability," "Pennsylvania courts have consistently required more evidence than the existence of a current business or contractual relationship." *Phillips*, 959 A.2d at 429. That is the only evidence BP has proffered. BP relies on its assertion that it "had an exclusive, ten (10) year relationship with Stericycle for one of the subject facilities." Pl.'s Resp. to Def.'s Mot. for Sum. J. 17. Accordingly, it argues, "one can justifiably assume that the contracts with Stericycle would have been renewed" absent Republic's interference. *Id*. As the Pennsylvania courts have made clear, a mere historical relationship between parties is not sufficient to show a

14

prospective contractual relationship. For example, the state supreme court, in *Thompson Coal*, held that the plaintiff had failed to show a reasonable probability that a lease at issue would be extended. The court pointed out that the parties agreed that the lease would run until a specific date, in 1975; this fact provides "no reasonable basis for either party to expect a perpetuation of the leasehold beyond that point." *Thompson Coal*, 412 A.2d at 472. Similarly, that BP's agreements with Stericycle both included termination dates provides no reasonable basis for either party to have expected those contracts to be continued into the future. As the *Phillips* court noted, BP's points about its history with Stericycle "amount merely to an assumption of a *future* contractual relationship based upon evidence of an *existing* contractual relationship. . . . [T]his evidence alone is insufficient as a matter of law to establish a 'prospective contractual relationship.'" 959 A.2d at 429. BP has produced no evidence to show a reasonable probability that, but for Republic's actions, it would have had future contracts with Stericycle. As a result, and in addition to the reasons stated above, Republic is entitled to summary judgment on Count II.

### B.    Breach of Contract

In Count III of its Amended Complaint, BP alleges that Republic breached the November 24, 2004 Service Agreement relating to the Bridgeview facility. To review the factual basis for this claim: In 2004, BP entered into a Service Agreement with an unknown Republic-affiliated entity[6] to service BP's Bridgeview account. In its briefing, BP describes the contract as committing Allied Waste to provide hauling services for BP's Bridgeview account through 2011. BP argues that Republic is bound by the

---

[6] It is not clear who signed this agreement with BP, as three entities are referenced in the contract: The BFI business logo appears on the first page of the agreement; the signature line describes an unspecified "Browning-Ferris Industries Subsidiary;" and Allied Waste appears as the signatory to the contract.

obligation as Allied Waste's successor-in-interest, and that it breached this duty by contracting with and directly working for Stericycle at the Bridgeview location. Republic claims that it is not a party to the contract with BP, and is not bound by it. The Service Agreement was signed by Allied Waste, written on a BFI form, and named an unspecified "Browning-Ferris Industries Subsidiary," but Republic operates separately from all three entities, it argues. Regardless, Republic claims that there was no contract breach because the Service Agreement was no more than a commitment by its affiliate to provide hauling services to the extent necessary to service BP's Bridgeview account. Once Stericycle determined it no longer needed BP's services, BP no longer required Republic's services, rendering the agreement irrelevant.

It is undisputed that named Defendant Republic was not a party to the Service Agreement with BP. Indeed, BP describes the contract as binding Allied Waste directly, and binding Republic only as Allied Waste's successor-in-interest. Allied Waste is not a defendant in this suit, and BP's theory of recovery against Republic is based solely on successor liability. However, under Pennsylvania law, "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308 (3d Cir. 1985) (quoting *McClinton v. Rockford Punch Press & Mfg. Co.*, 549 F. Supp. 835, 837 (E.D. Pa. 1982)). Only four circumstances will render the purchasing company liable for the debts of the predecessor company: (i) the purchaser expressly agrees to assume those obligations; (ii) the transaction is a *de facto* merger; (iii) the purchaser is a mere continuation of the predecessor; or (iv) the transaction was fraudulently entered into to escape liability. *Id.* at

16

308-09. Similarly, liability does not automatically confer to parents of subsidiary corporations. "[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent." *Pearson v. Component Technology Corp.*, 247 F.3d 471, 484 (3d Cir.2001) (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)). However, a court may pierce the corporate veil in order to prevent abuse of the corporate form. *See Id.* at 484. Importantly, Pennsylvania law does not permit piercing of the corporate veil "unless the party seeking to pierce the corporate veil on an alter-ego theory establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." *Culbreth v. Amosa* (Pty) Ltd., 898 F.2d 13, 14 (3d Cir.1990).

Here, BP has provided no evidence that would establish one of the four circumstances allowing successor liability. Nor has it provided any evidence that would justify piercing the veil. Indeed, BP does not discuss the circumstances or the rules of successor liability or corporate veil piercing in its briefing at all. Because BP has presented no evidence to justify holding Republic accountable for the Service Agreement between BP and Allied Waste, Republic is entitled to summary judgment on Count III.

## III.   CONCLUSION

For the reasons stated above, Defendant Republic's Motion for Summary Judgment is GRANTED as to all counts of the Amended Complaint.

**s/Anita B. Brody**

_____

ANITA B. BRODY, J.